Judge Marshall
delivered the Opinion of the Court.
This bill was filed in the Louisville Chancery Court, by Perry, a negro man, to assert and establish his right to freedom, against John B. Hundley, who claimed and had long held him as a slave.
The complainant claims his freedom under a deed of emancipation executed by his former owner, Charles Hammond, of Anne Arundell county in the State of Ma *360 ryland. Which deed, bearing date the 7th day of May, 1802, was proved and recorded in the county of Anne Arundel], and afterwards recorded in the county of Jefferson in this State, to which several of the slaves emancipated thereby, had been removed. Among twenty two negroes, whom this deed purports to emancipate— to be free at different periods, are Deb and her two children, Perry and Mace: Deb to be free in 1804; Perry, the present complainant, in 1822, and Nace in 1824.
Hundley, in his answer, admits that Hammond was the former owner of Deb and Perry and Nace, and that he executed the deed of emancipation set up in the bill; but charges that said Hammond was not, at the date of the deed, and has not been at any time since, the owner or master of the complainant, and that he had not then, and has not since had, any right, in law or equity, to set free the complainant, or, in any manner, to control his services; “because, as the defendant expressly charges; the said Hammond did, on the 16th day of February, 1801, for a good and valuable consideration, sell and dispose of the said complainant, with his mother and brother, to one Edward Dorsey; and that, on the same day, the said Hammond, on delivering the complainant, with his said mother and brother, did execute to said Dorsey, his receipt in full payment” for them; which receipt is exhibited with the answer, and is as follows: “Received — Feb. 16th, 1801 — of Edward Dorsey, seven “ pounds ten shillings, it being full payment for one ne- “ gro woman named Deb, and her two children named “ Nace and Perry.
“Teste, Charles Hammond of Chs.
uIsaac Randall.”
The names of Hammond and Randall, upon this receipt, were proved to be in their respective hand-writings; and it was further proved that, in the spring of 1801, Edward Dorsey removed from Maryland to Kentucky, bringing with him the three negroes Deb, Perry and Nace; that he used them as slaves until his death in 1804; after which, Perry remained in his family until the year 1822, when Hundley having intermarried with one of Dorsey’s daughters, acquired, in right of his wife, *361 and, as he says, by purchase from the other heirs, the sole interest in him, and has held him as a slave ever since. It was also proved that, at the date of the receipt exhibited in the answer, Deb, who was about twenty years old, and her two children, (of whom one was about three or four, and the other, one or two years of age,) were worth in Maryland from four hundred and fifty to five hundred dollars; that Dorsey owned the husband of Deb, and was about to bring him to Kentucky; and a witness for the defendant, says he understood that Doivsey bought Deb and her children to prevent a separation; but he does not pretend to any particular knowledge of the transaction between Hammond and Dorsey.
Hammond is dead, but the period of his death is not stated. A witness, whose deposition was taken on both sides, in reply to a general interrogatory filed by the complainant, requiring him to state what further he knows material for the complainant, states, that “he be- “ heves a deed of manumission was drawn up and exe- “ cuted by said Hammond, for the emancipation of said “ negro woman Deb, and her two children, and others “ named in the last deed, and that the same was not re- “ corded within the time required by the laws of Maryland; he thinks the deed was executed in the year u 1800; he believes the deed of 1802 was designed to “ carry out the object of the deed previously executed, “ but not recorded in time.”
The Chancellor decreed that Perry was of right a free man, and that Hundley should pay him three hundred dollars for his services, which are proved to have been worth one hundred dollars a year, since 1830. From this decree, Hundley has appealed.
The main question in the case is, whether, upon the pleadings and evidence, it can be determined, with reasonable certainty, that, before the execution of the deed of May, 1802, Hammond had divested himself of all right in Perry, so that his deed of emancipation, then made, could not have any operation in favor of Perry.
It is alleged by the defendant Hundley, that he did so divest himself, by a sale and transfer of Perry &c. to Dorsey, on the 16th of February, 1801.
*362 Under tire admission that Hammond was the previous owner of Perry, and the necessary inference that unless, prior to May, 1802, he had made such a transfer of his right as disabled him from making the deed of that date, it was obviously incumbent on Hundley to prove the substance of his allegation, by showing that Hammond had transferred to Dorsey the absolute property, or such other interest in Perry as prevented the deed from taking effect as to him, either in 1822, when, according to its terms, he was to be free, or at any subsequent period before the commencement of this suit. For, if he had a right to make Perry free from 1830 or 1835, and not sooner, we apprehend the deed purporting to emancipate him from 1822, must have its effect at any ■subsequent period when the right of the grantor became ■immediate.
Has Hundley proved that Perry was sold absolutely, as a slave for life, to Dorsey? He offers as proof of this fact, the receipt which has been copied, and the fact of Dorsey’s bringing the negroes, therein mentioned, to Kentucky, and retaining them in his service. The facts relating to the possession would certainly conduce to prove an absolute sale, if they stood alone and unexplained. But as this inference derives its strength mainly from the acquiescence of those who would have the right, if it was not with the possession, and as it would have bée^destroyed by a speedy reclamation of the ne-groes by Hammond, it would seem to be in some degree weakened by his executing, within a few months after-wards, a deed purporting to emancipate, at a future time, the. same negroes. It is, however, unnecessary to weigh the effect of the deed in this respect, or to give it any. The facts relating to the acquisition and retention of possession, do not stand alone, and are not wholly unexplained.
The receipt is stated by Hundley, to have been executed at the time of delivering the possession, and the fair inference from the proof is, that it was executed at or about that time. It is at least certain, that it relates to these negroes, and to the arrangement under which Dorsey obtained the possession and brought them to *363 Kentucky. And, although it does not purport to give the particulars of that transaction, yet as it is the only eotemporaneous writing relating to it which is exhibited in the cause, it is entitled to great weight, among the few facts whieh tend to elucidate the character of the transfer, and of the interest and possession held under it.
The fair inference from the language of this receipt is: — first, that the sum of £7 10, of which it acknowledges the payment, is the entire sum which was paid or to be paid on account of the transaction to which it refers as the consideration of the payment — “it (that is, the sum itself,) being stated to be full payment.” This inference is contested by the counsel for the appellant. But the most that can be said against it, is that it is not conclusive. And, if it be not, as we think it is, sufficiently sustained by the writing itself, it is confirmed by the manner in which the receipt is presented and relied on in the answer, and by the total absence of either allegation or proof going to show that there was, or was to have been, any other payment.
Second. A second and certain conclusion from the face of the writing, is that it does not, by its own tei’ms, transfer the title of the negroes, and that it does was not intended to furnish complete evidq particular terms of any transfer, or of the clhtfact, or consideration, to which it refers as the cause^|^^fiag^j|Q0j ment. It is emphatically a receipt in full, evidencing, 1 first, the sum paid; secondly, that it is theWErJSgps^^y which was to be paid, and thirdly, indicating tHfe^lransaction on account of which it was paid, by referringrnfc ly to the subject of it, without attempting to identify its particular terms. Certainly the word “for,” which is the only word in the writing that connects the payment with the subject on account of which it was made, does not necessarily import “for the purchase of,” or “for the absolute right or property in.” It may mean, “in consideration of,” or it may mean, “on account of.” But in neither sense does it denote absolutely, by its own force, the nature of the right or interest which is the cause or consideration of the payment. A man who had hired his *364 horse to another for a day, might, either on delivering or'receiving him back, give a receipt for one dollar as full payment for the horse, without furnishing conclusive, if it should even be deemed prima facie, evidence of having parted with his entire right. The indefinite import of the word ‘for’ would, in such a case, be restricted by proof of the hiring, to which, without proof of other transfer, it would of course be applied; or it might be restricted by other proof, intrinsic or extrinsic, going to show that there was not an absolute sale, but a transfer of a limited interest only.
Third. Applying, then, to the facts evidenced by this receipt thus explained, the extrinsic facts, that the ne-groes, ‘on account of’ which, or ‘in consideration of’ which, the payment was made, were worth, as slaves for life, about twenty times the entire sum paid; that no consideration of love and affection towards Dorsey, and no ground of presuming a gratuity or bounty to him, is shown or pretended; but that a strong feeling of benevolence on the part of Hammond towards those ne-groes and others belonging to him, is established by the proof, and the inference presses powerfully upon the mind, that the interest actually transferred, and for which the payment was made, was not the absolute right of property in the negroes as slaves for life, but a temporary, limited interest in their future services, bearing some nearer proportion in its value to the consideration paid for it, and not inconsistent with the benevolent intentions of Hammond. This inference is not inconsistent with any fact proved in the cause, and is corroborated by several circumstances: by the entire absence of any direct proof, written or parol, showing an absolute transfer of title — although there seems to have been a subscribing witness to the receipt; by the non-production, of the usual instrument of transfer — a bill of sale; by the absence of any proof showing that the negro woman, Deb, was retained in the service of Dorsey’s family after 1804, when, by the terms of the deed which is exhibited, she was to be free; and by the motive which led to the transfer of the possession to Dorsey, viz. a desire or willingness that Deb and her children *365 should not be separated from the husband and father, who was about to be removed to Kentucky. To this motive, Dorsey made no sacrifice of interest in paying £7 10, or $25, even for the limited interest which he might have acquired consistently with the terms of the deed of emancipation of 1802, but to which Hammond did make some sacrifice, in transferring even an interest thus limited. This motive of benevolence would not at all account for a gift of the negroes as slaves to a stranger; but is perfectly consistent with and tends to prove a transfer of such a limited interest as would amply compensate Dorsey for his money paid, and for the trouble and expense of removing them to Kentucky, and there maintaining the two children until they should be capable of useful service.
The delivery of the negroes to Dorsey; his removing them to Kentucky, and holding them in service until his death in 1804, and the subsequent detention by his family, of the two boys, then about six or eight years old, is not, up to the year 1822, at all inconsistent with the inferences fairiy deducible from the other facts; the detention of Perry after 1822, is obviously entitled to but little if any influence in determining his right. His mother, Deb, does not appear to have been detained after 1804. Had Dorsey lived, Perry might not have been detained after 1822.
Fourth. But another fact remains to be noticed: the existence of which, if sufficiently established, does not leave a reasonable doubt that the interest transferred to Dorsey, was in entire subordination to the terms of the deed of emancipation of 1802. This is, indeed, the probable and rational inference from the facts already considered. But if Hammond had in fact executed a previous deed of emancipation similar to that now exhibited, which failed of its effect only because it was not recorded in time, there is ample evidence in the circumstances now appearing, to show that, even if the failure of the first act was ascertained when these negroes were transferred to Dorsey, its motive, and the intention to effectuate its object, still remained; and the same circumstances, and especially the small sum paid for the *366 transfer, leave no room to doubt that Dorsey was not ignorant of the motive and intention of Hammond, nor of his previous attempt to secure the freedom of the ne-groes, and that, in the transfer to him, this right of freedom was understood to have been already secured, or the power of securing it was reserved by limiting the interest transferred.
The witness who speaks of this previous deed (Charles G. Dorsey,) being the witness of both parties, probably the relative of the defendant’s father-in-law, Dorsey, under whom he claims, must be assumed to be credible and impartial; his deposition proves him to be a cautious witness — distinguishing between mere impressions derived from rumor, and belief derived from his own observation or knowledge of the fact. Although, therefore, he says that he believes such a deed was made, and he thinks it was executed in the year 1800, without inform directly asserting the facts to be so, yet as this is his own language, and his own voluntary statement, not drawn out by direct interrogatory, nor subjected to explanation by further interrogatory, and as no exception seems to have been taken to it, in the Court below, and as, moreover, we are of opinion that the witness is not to be understood as speaking from mere rumor, but from some knowledge, though perhaps not a very precise one, of the fact to which he refers; and as his statement is entirely consistent with the other principal facts, which lead to the inference that Hammond intended to emancipate his negroes, if he had not done it — we think it may be assumed, upon the evidence, that he had executed a deed of emancipation of similar import with that of 1802, before Dorsey acquired any interest in Perry. Such prior deed cannot, it is true, operate as a deed of emancipation; but the fact that it was executed tends to prove, and in connection with the other facts of the case, sufficiently establishes the conclusion, that the transfer to Dorsey, was not inconsistent with the right of Hammond to emancipate the three negroes according to the terms of the deed of 1802. And that, consequently, the deed of that date, whereby Perry was emancipated in 1822, must have the effect of making him free from that time.
A colored man, who,having been held in slavery, establishes his right to freedom, cannot, at law or in chancery, recover compensation for his services, or damages for his detention, without showing that the deft, detained him with a full knowledge of his right, or with good reason to believe him free.
But as it does not appear that, when Hundley took possession of Perry, or while he held him in servitude, prior to the commencement of this suit, he knew or believed that Perry was entitled to be free, or had knowledge of the particular facts on which his right is now made manifest, or had good reason to suppose that he was holding a free man in servitude, we are .of opinion that this case is not one which, according to the principles heretofore applied to the subject, entitles Perry to damages, from Hundley, for the value of his services.
Wherefore, the decree, so far as it establishes and declares Perry’s right to freedom, is affirmed; but so far as it decrees damages against Hundley for the services of Perry, the same is reversed, and the cause is remanded, that said decree may be modified accordingly. But the appellant is not entitled to recover his costs in this Court.